```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                          EASTERN DIVISION
```

STRUCTURAL POLYMER GROUP, LTD., )
and STRUCTURAL POLYMER          )
SYSTEMS, LTD.,                  )
                                )
         Plaintiffs,            )
                                )
    vs.                         )    No. 4:05-CV-321 (CEJ)
                                )
ZOLTEK CORPORATION,             )
                                )
         Defendant.             )

## **MEMORANDUM AND ORDER**

This matter is before the Court on defendant's motion for summary judgment on Count I of plaintiff's second amended complaint. Plaintiff opposes the motion and the issues are fully briefed.

Plaintiffs Structural Polymer Group, Limited (SPG) and Structural Polymer Systems, Limited (SP Systems) bring this action against defendant Zoltek Corporation, asserting two claims of breach of contract, based upon defendant's alleged failure to supply two carbon fiber products -- PANEX 33 and PANEX 35 -- in compliance with an exclusive requirements contract. In Count I, plaintiffs claim that defendant breached the parties' agreement in 2004 by refusing to provide PANEX 35; in Count II, they allege that defendant refused to provide PANEX 33 in 2005.[1] Defendant has filed

---

[1] Plaintiffs initially filed a one-count complaint directed toward defendant's refusal to supply PANEX 35. Plaintiffs also filed a motion for preliminary injunction, seeking an order directing defendant to supply PANEX 35 under the Supply Agreement. The Court denied plaintiffs' motion after a hearing, finding that, while the Supply Agreement clearly obligated defendant to supply PANEX 33, plaintiffs had mot established that defendant was

a counterclaim for breach of contract, alleging, *inter alia*, that plaintiffs breached the Supply Agreement by purchasing carbon fibers from other sellers without good reason. In the instant motion, defendant moves for summary judgment on plaintiffs' PANEX 35 claim, contending that the parties' agreement obligated it to supply only PANEX 33.

I. **Legal Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment the court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. AgriStor Leasing v. Farrow, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Fed. R. Civ. P. 56(c). Once the moving party has met its burden, the non-moving party may not

---

required to supply PANEX 35. Plaintiffs immediately placed orders for PANEX 33, which defendant indicated it would not fill. Plaintiffs then amended their complaint to add the count directed to PANEX 33.

rest on the allegations of his pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corporation v. Catrett, 477 U.S. 317, 322 (1986).[2]

## II. Background

Defendant Zoltek manufactures large filament count carbon fibers, including the PANEX 33 and PANEX 35 products. Zoltek manufactures PANEX 33 using a precursor obtained from a third party. In 2002, defendant introduced PANEX 35, which is made with defendant's own precursor material. Plaintiffs use large filament count carbon fibers to produce prepregs[3] and fiber-reinforced composites which they in turn sell to manufacturers of wind turbine blades. PANEX 35 is more suitable than PANEX 33 for use in the wind energy industry.

---

[2] As defendant notes, the Court previously denied plaintiffs' motion for preliminary injunction on the PANEX 35 claim, based upon a finding that plaintiffs failed to establish a likelihood of success on the merits of the claim. Of course the standards and burdens are different at the two stages of the proceedings: plaintiffs carried the burden at the preliminary injunction stage, while defendant has the burden at this stage.

[3] A "prepreg" is a ready-to-mold material impregnated with resin.

-3-

On November 6, 2000, the parties signed an exclusive requirements contract ("the Supply Agreement"), pursuant to which defendant (referred to as "Seller" in the Supply Agreement) agreed to supply 100% of plaintiffs' (the "Buyer") needs for carbon fibers, through December 31, 2010. Because the dispute centers on the meaning of the term "Carbon Fibers," some of the provisions in which the term appears will be set forth here.

The second paragraph of the Supply Agreement states:

> **CARBON FIBERS**: Large Filament Count Carbon Fibers (the "Carbon Fibers") as defined by Zoltek PANEX 33 specifications.

The fourth paragraph states:

> **QUANTITY**: Pursuant to this Agreement for Carbon Fibers, Seller agrees to manufacture for and sell and supply 100% of the requirements of Carbon Fibers of Buyer and Buyer's subsidiaries. Buyer expressly agrees that Buyer and its subsidiaries will obtain their total requirements for suitable quality, in the reasonable opinion of the Buyer, Carbon Fibers from Seller and from no other source . . . except as otherwise permitted herein (subject only to such Carbon Fibers being, in the reasonable opinion of the Buyer, of suitable quality). Notwithstanding the foregoing, if a customer requires that Buyer use Carbon Fibers produced by a manufacturer other than Seller ("Third Party Fibers"), Buyer may purchase such Third Party Fibers so long as: (1) Buyer uses commercially reasonable efforts to promote Seller's Carbon Fibers to such customer; and (2) Buyer keeps Seller informed regarding the amount and pricing of Buyer's purchases and sales of Third Party Fibers. The maximum quantity Seller will be obligated to supply in a given Contract Year will be equal to the amount actually purchased by Buyer in the preceeding [sic] Contract Year plus one million (1,000,000) pounds.

The fifth paragraph provides that defendant will set the price "for Carbon Fibers for any given year at the then-current market price for Seller's Carbon Fibers in accordance with price protection clauses included in this Agreement".

The eighth paragraph states:

> **PRICE PROTECTION**: If another producer of Carbon Fibers offers Buyer Carbon Fibers of like quality in a quantity then equal to or greater than that remaining for delivery hereunder during the remainder of this Agreement, at a lower cost . . . but otherwise on substantially similar terms and conditions as herein provided, and Buyer furnishes Seller with written notice, then Seller shall within ten (10) days . . . (a) meet such lower price, or (b) permit Buyer to purchase from such other producer . . .  If Buyer purchases Carbon Fibers under (b) . . ., this Agreement shall remain otherwise unaffected.

The ninth paragraph provides:

> **TERMINATION**: [T]his Agreement may be terminated . . . by the Buyer if Seller fails to maintain its position of a satisfactory long term supplier of Carbon Fibers to the Buyer by not remaining competitive in quality, delivery, or manufacture of Carbon Fibers of advanced design or processing or on other terms with other third party producers of Carbon Fibers of comparable quality . . . [If Seller fails to cure] and the Buyer purchases Carbon Fibers from other manufacturers, the quantities so purchased shall be deleted from the annual purchase requirement. . . .

The parties entered the Supply Agreement in conjunction with defendant's sale of SP Systems. Defendant had purchased SP Systems in 1999, in anticipation of growth in the wind energy business. When that growth did not materialize as quickly as hoped, defendant resold SP Systems to its former shareholders, plaintiff SPG. On November 6, 2000, the parties executed both the Supply Agreement and a Stock Purchase Agreement. The Stock Purchase Agreement included a provision stating the parties would "cause to be entered into the Supply Agreement . . . in the form of Exhibit G attached hereto, to provide for the Seller or its subsidiaries to supply SP Systems with all of its supply requirements pertaining to commercial carbon fibers."[4]  The Stock Purchase Agreement also

---

[4] In connection with the sale, SP Systems also granted defendant a license to use certain formulations and a license to use proprietary composite process technology.

-5-

contained an integration clause, providing that "[t]his Agreement, including any . . . exhibit . . ., constitutes the entire agreement between the parties. There are no verbal agreements, representations, warranties, undertakings or agreements between the parties, and this Agreement may not be amended or modified in any respect, except by a written instrument signed by the parties to this Agreement." § 15.5. Both the Supply Agreement and the Stock Purchase Agreement provided that the substantive laws of Missouri, and not its choice of law rules, would govern any disputes.

Plaintiffs assert that the parties always intended that defendant would supply its new formulation under the 2000 Supply Agreement. Daniel Greenwell was formerly employed as defendant's Chief Financial Officer during the relevant period, and he negotiated and signed the Supply Agreement on defendant's behalf. He states that when the parties negotiated the Supply Agreement, defendant produced only the PANEX 33 product. In an affidavit, Greenwell states that the end users of the composite materials set the specifications for the type of carbon fibers needed. Thus, a contract limited to PANEX 33 would not have been beneficial to either party. According to Greenwell, the term "Large Filament Count Carbon Fibers (the 'Carbon Fibers') as defined by Zoltek PANEX 33 qualifications" means "any large tow [5] carbon fiber that has certain specifications desirable to the end customer." Greenwell further states that the parties understood that defendant planned to develop its own precursor material; indeed, defendant

---

[5] "Large tow carbon fibers" is another term for "large filament count carbon fibers."

-6-

had stated this in its SEC filings. Greenwell states that it would have been contrary to defendant's intentions of developing its own precursor to enter a long-term supply agreement that restricted it to providing a product made with third-party precursor.

Paul Lyon of SP Systems reiterates much of what Greenwell states. He adds that the parties anticipated that defendant would continue to make improvements in the products. Lyon also states in his affidavit that plaintiffs' needs for carbon fibers increased during 2004; during the parties' discussions regarding the orders for 2004, defendant never suggested that plaintiffs accept PANEX 33. Lyon states that defendant struggled to supply plaintiffs' orders throughout 2004; defendant subsequently announced that it entered into long-term supply contracts with two customers in the wind energy market, Gamesa and Vestas, which are both major long-standing clients of plaintiffs'. Plaintiffs have been unable to obtain their needs for large filament carbon fibers from other manufacturers.

Adrian Williams of SP Systems states in his affidavit that defendant stopped marketing PANEX 33 once it developed PANEX 35 because PANEX 35 is a superior product. And, unlike PANEX 33, PANEX 35 was tested and certified for design and production of wind blades.

Plaintiffs contend that the parties' course of dealing establishes that the parties intended the 2000 Supply Agreement to apply to PANEX 35. The record indicates that plaintiffs did not order significant amounts of carbon fibers from defendant in 2002 and 2003. Even with the limited supply plaintiffs rejected a

shipment of PANEX 33 in 2002, based upon concerns over its quality. Defendant suggested that the rejected shipment be replaced with PANEX 35.

Beginning in 2004, plaintiffs' customers requested product made with PANEX 35. In April 2004, the parties executed a document entitled "PANEX 35 Supply/Purchase Agreement," pursuant to which defendant agreed to provide and plaintiff agreed to order a minimum of 160 metric tons during 2004. In July 2004, plaintiffs again increased their orders of PANEX 35 in response to customer demand. The record contains reprints of e-mails between Lyon and Tim McCarthy of Zoltek, indicating that defendant struggled to meet plaintiffs' order for PANEX 35 and that defendant's delay in doing so caused significant disruptions in plaintiffs' manufacturing.

During 2004, the parties discussed a supply contract for PANEX 35. On July 26, 2004, McCarthy noted in an e-mail to Lyon that plaintiffs' 2005 orders increased the importance of the parties' planned "discussion . . . as we are now clearly in a situation where we have to add new capacity in order to meet your demands." On August 11, 2004, Lyon agreed "we need to press to ratify the 2005 agreement and volume commitment." The record contains a draft agreement pursuant to which defendant agreed to supply 500 metric tons of PANEX 35 in 2005. That document was never signed by either party.

Plaintiffs contend that PANEX 35 is a "large filament carbon fiber" within the specifications of PANEX 33. They submit the affidavit of Jon DeVault, whose resume indicates he is an expert in the advanced material industry. DeVault states that both PANEX 33

and PANEX 35 are "standard modulus" carbon fibers (i.e., carbon fibers with a tensile modulus between 32 and 35 million pounds per square inch) of the type required by the parties' wind energy customers. DeVault states that the two products are identical on five out of six specifications.[6] With regard to the sixth specification -- tensile modulus -- DeVault states that PANEX 33 and PANEX 35 are interchangeable for the uses of the wind-energy business.

### III. Discussion

The parties propose two different meanings for the term "Large Filament Count Carbon Fibers (the 'Carbon Fibers') as defined by Zoltek PANEX 33 specifications." The complete term appears only in the second paragraph of the Agreement; thereafter, the phrase "Carbon Fibers" is used. Plaintiffs assert that the term means "large filament count carbon fibers having the same material specifications as PANEX 33," while defendant asserts that it means "PANEX 33."

The cardinal principle of contract interpretation is to ascertain the intention of the parties and to give effect to that intent. Dunn Indus. Group, Inc. v. City of Sugar Creek, 112 S.W.3d 421, 428 (Mo. 2003) (*en banc*). The terms of a contract are read as a whole to determine the intention of the parties and are given their plain, ordinary, and usual meaning. Id. Additionally, each term of a contract is construed to avoid rendering other terms

---

[6] The five specifications are tensile strength, electrical resistivity, density, fiber diameter, and carbon content.

meaningless.  Id.  A construction that attributes a reasonable meaning to all the provisions of the agreement is preferred to one that leaves some of the provisions without function or sense.  Id.

Whether a contract is ambiguous is a question of law. Klonoski v. Cardiovascular Consultants of Cape Girardeau, Inc., 171 S.W.3d 70, 72 (Mo. Ct. App. 2005).  To determine whether a contract is ambiguous, courts consider the whole instrument and give the words in the contract their natural and ordinary meaning.  PlaNet Productions, Inc. v. Shank, 119 F.3d. 729, 732 (8th Cir. 1997) (quoting Angoff v. Mersman, 917 S.W.2d 207, 211 (Mo. Ct. App. 1996)).  A contract is ambiguous only if its terms are susceptible to fair and honest differences.  Dunn, 112 S.W.3d at 428; see also Union Elec. Co. v. Consolidation Coal Co., 188 F.3d 998, 1002 (8th Cir. 1999) (under Missouri law, contract terms are ambiguous only if they are reasonably susceptible to more than one interpretation so that reasonable persons may honestly disagree over the terms' meaning).  Parol evidence may not used to modify or contradict the unambiguous terms of a written contract purporting to incorporate the whole agreement between the parties.  PlaNet Productions, 119 F.3d at 732 (quoting South Side Plumbing Co. v. Tigges, 525 S.W.2d 583, 588 (Mo. Ct. App. 1975)).  Where a contract is ambiguous, use of extrinsic evidence for interpretation is proper.  Klonoski, 171 S.W.3d at 73 (quoting Thomas v. B.K.S. Dev. Corp., 77 S.W.3d 53, 59 (Mo. Ct. App. 2002)).  Missouri law recognizes that ambiguities in written instruments may be of two kinds: (1) patent, arising upon the face of the documents, and (2) latent.  Royal Banks of Missouri v. Fridkin, 819 S.W.2d 359, 362 (Mo. 1991) (*en banc*).  A latent

ambiguity arises where a writing on its face appears clear and unambiguous but some collateral matter makes the meaning uncertain. Id. A latent ambiguity is not apparent on the face of the writing and therefore, must be developed by extrinsic evidence. Id.; see also Federal Deposit Ins. Corp. v. W.R. Grace & Co., 877 F.2d 614, 620-22 (7th Cir. 1989) (discussing Illinois law on "intrinsic" and "extrinsic" ambiguity and stating that, "parol and other extrinsic evidence is admissible, even in a case involving an integration clause, to demonstrate that the contract is ambiguous."). Resolution of an ambiguity is a question of fact. Klonoski, 171 S.W.3d at 73; see also AGFA-Gevaert, A.G. v. A.B. Dick Co., 879 F.2d 1518, 1522 (7th Cir. 1989) (district court erred in directing verdict on liability issues where the "term 'A-1 Copier Machines' *may* have been a maladroit shorthand for 'low-volume plain-paper copier machines.'") (emphasis in original).

Plaintiffs first argue that if the parties intended to limit the Supply Agreement to PANEX 33, the term would have stated: "Large Filament Count Carbon Fibers as defined by Zoltek PANEX 33 specifications (the 'Carbon Fibers')." It is not readily apparent that changing the location of the parenthetical clarifies the construction of the term. Plaintiffs' argument highlights another point, however: the parties did not describe the product as PANEX 33, which would have removed all possible ambiguity. Defendant's construction of the term arguably leaves the phrases "Large Filament Count Carbon Fibers," "as defined by," and

"specifications" without function or sense, in clear violation of a principle of construction. Dunn, 112 S.W.3d at 428.

The term at issue -- "Large Filament Count Carbon Fibers . . . as defined by Zoltek PANEX 33 specifications" -- follows the phrase, **CARBON FIBERS**, thus indicating that the phrase **CARBON FIBERS** is defined as "Large Filament Count Carbon Fibers (the "Carbon Fibers") as defined by Zoltek PANEX 33 specifications;" this definitional function is reinforced by the parenthetical. "Carbon Fibers" means "Large Filament Count Carbon Fibers . . . as defined by Zoltek PANEX 33 specifications."

The Agreement uses the term "Carbon Fibers" in three forms: "Carbon Fibers," "Third Party Fibers," and "Seller's Carbon Fibers." The unmodified term "Carbon Fibers" sometimes refers to defendant's product and at other times to a competitor's product. For example, the termination provision refers to defendant's position as "a satisfactory long term supplier of Carbon Fibers," and to plaintiffs' purchases of "Carbon Fibers from other manufacturers." The Quantity and Price Protection provisions contain additional examples. Plaintiffs argue that the term "Carbon Fibers" is not synonymous with "PANEX 33" because, by definition, third party providers of "Carbon Fibers" cannot supply PANEX 33. Thus, plaintiffs assert, "Carbon Fibers" must refer to the broader category of carbon fibers having the same material specifications as PANEX 33; according to plaintiffs, this category includes PANEX 35.

The Court concludes that the Supply Agreement is ambiguous, in that the terms are reasonably susceptible to more than one interpretation so that reasonable persons may disagree over their meaning. Union Electric Co., 188 F.3d at 1002. The Court has reached this conclusion based upon the language of the Agreement itself. Extrinsic evidence strengthens the conclusion: At the time the Supply Agreement was signed, defendant's sole product was PANEX 33; the parties anticipated that defendant would continue to improve its product to better meet the needs of their mutual customers. It is possible that the parties intended the agreement to extend to new products having the identical critical specifications. It is also possible that the parties intended to renegotiate a new contract once a new product was developed. This interpretation finds some support in the fact that the parties signed a PANEX 35 Supply Agreement in 2004. These questions and others cannot be decided at the summary judgment stage and defendant's motion must be denied.

Accordingly,

**IT IS HEREBY ORDERED** that defendant's motion for summary judgment [#23] is **denied**.

**IT IS FURTHER ORDERED** that plaintiff's motion to expedite [#39] is **denied as moot**.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 21st day of February, 2006.